**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**
**NEWARK DIVISION**

Jane Doe (C.J.), an individual
Plaintiff

v.

AASHIRVAD, LLC, D/B/A ECONO
LODGE, CHOICE HOTELS
INTERNATIONAL SERVICES CORP.,
AND CHOICE HOTELS
INTERNATIONAL INC.

CIVIL ACTION NO: 2:23-cv-02973

## FIRST AMENDED COMPLAINT

COMES NOW Plaintiff Jane Doe (C.J.), by and through the undersigned counsel, and respectfully submits her complaint for damages and makes the following averments.

## SUMMARY

1. As sex trafficking has grown to epidemic proportions, it has become widely recognized that we must look beyond just the pimp and sex buyer in order to stop sex trafficking. We must look to the other individuals and entities who facilitate and benefit from sex trafficking.

2. The facilitation of sex trafficking is unlawful under federal law. The Trafficking Victims Protection Reauthorization Act ("TRVPA"), 18 U.S.C. § 1581, *et seq*, expands trafficking liability beyond the sex seller and buyer to also prohibit individuals or entities from knowingly benefiting or attempting to benefit "financially or by receiving anything of value from participation in a venture which that person knew or should have known" was engaged in trafficking.

3. This case is about the continuous sex trafficking of C.J. that occurred at an Econo Lodge located at 853 Spring St., Elizabeth, NJ 07201[1] ("subject Econo Lodge"). Econo Lodge was

---

[1] The address of this hotel at times also appears as 819 Spring St., Elizabeth, NJ 01201.

1

owned and operated by Aashirvad, LLC , as a franchisee of Choice Hotels International Services Corp, otherwise known as Choice Hotels International, Inc.

4.      As discussed herein, each of the defendants in this case knowingly benefitted from participation in a venture that facilitated trafficking and ultimately, C.J.'s trafficking at the subject Econo Lodge. Accordingly, C.J. brings suit under the TVPRA.

## JURISDICTION & VENUE

5.      This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the TVPRA.

6.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this claim occurred in this District and Division.

7.      C.J. was trafficked in this District and Division.

## PARTIES

8.      C.J. is a natural person who is currently a resident and citizen of Ohio.

9.      Defendant Aashirvad, LLC, d/b/a Econo Lodge, is a limited liability company doing business in New Jersey. It can be served through its registered agent, Prakashbhai S. Patel at 134 Hawthorne St., Roselle Park, NJ 07204. Aashirvad, LLC, will be referred to as "Franchisee."

10.     Defendant Choice Hotels International Services Corp., d/b/a Econo Lodge is a Delaware corporation. It can be served by its registered agent:  Corporate Service Company, 251 Little Falls Drive, Wilmington, DE  19808.

11.     Defendant Choice Hotels International, Inc. d/b/a Econo Lodge is a Delaware corporation. It can be served by its registered agent:  Corporate Service Company, 251 Little Falls Drive, Wilmington, DE  19808.

2

12. Defendants Choice Hotels International Services Corp. and Choice Hotels International., Inc. will collectively be referred to as "Choice."

## FACTS

**The Hotel Industry's Role in Sex Trafficking**

13. What Defendants knew or should have known about the sex trafficking that was occurring in their jointly operated hotel, including the trafficking of C.J., is shaped by the widely known and pervasive relationship between the hotel industry and sex trafficking.

14. Defendants are aware of the important role that hotels play in the proliferation of sex trafficking and of the revenue they derive from sex trafficking, both directly and indirectly, from sex trafficking that occurs at their properties. Today, sex slavery is pervasive in the United States, and hotels are the primary place where it happens.[2] For years, sex traffickers have "been able to reap these profits with little risk when attempting to operate within hotels."[3] In 2014, 92% of calls received by the National Human Trafficking Hotline involved reports of sex trafficking taking place at hotels.[4] Hotels have been found to account for over 90% of commercial exploitation of children.[5]

15. To address the crisis of sex trafficking at hotels, multiple agencies and organizations who actively combat sex trafficking, including the United States Department of

---

[2] "This is not only a dominant issue, it's an epidemic issue." *See* Jaclyn Galucci, *Human Trafficking is an Epidemic in the U.S. It's Also Big Business*, Fortune (April 2019),https://fortune.com/2019/04/14/human-sex-trafficking-us-slavery/ (citing Cindy McCain, who chairs the McCain Institute's Human Trafficking Advisory Council). "It's also something that is hiding in plain sight. It's everywhere—it's absolutely everywhere." *Id.*

[3] *See Human Trafficking in the Hotel Industry*, Polaris Project (Feb. 10, 2016), https://polarisproject.org/blog/2016/02/10/human-trafficking-hotel-industry; *see also* Eleanor Goldberg, *You Could Help Save A Trafficking Victim's Life With Your Hotel Room Pic*, Huffington Post (June 2016), http://www.huffingtonpost.com/entry/taking-a-photo-of-your-hotel-room-could-help-save-a-trafficking-victimslife_us_57714091e4b0f168323a1ed7.

[4] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hotel Industry*, Cornell Hotel Report (Oct. 2015), https://scholarship.sha.cornell.edu/cgi/viewcontent.cgi?article=1222&context=chrpubs.

[5] *See* Erika R. George and Scarlet R. Smith, *In Good Company: How Corporate Social Responsibility Can Protect Rights and Aid Efforts to End Child Sex Trafficking and Modern Slavery*, 46 N.Y.U. J. Int'l L. & Pol. 55, 66-67 (2013).

Homeland Security, the National Center for Missing and Exploited Children, the Polaris Project, the Texas Attorney General, Love 146, EPCAT, among others, have established recommended policies and procedures for recognizing the signs of sex trafficking.[6]

16.    Some of the recommended policies and procedures intended to reduce or eliminate sex trafficking, which Defendants are aware or should be aware of, include learning to identify warning signs and indicators of sex trafficking, including but not limited to:[7]

- Individuals show signs of fear, anxiety, tension, submission, and/or nervousness;

- Individuals show signs of physical abuse, restraint, and/or confinement;

- Individuals exhibit evidence of verbal threats, emotional abuse, and/or being treated in a demeaning way;

- Individuals show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior;

- Individuals lack freedom of movement or are constantly monitored;

- Individuals avoid eye contact and interaction with others;

- Individuals have no control over or possession of money or ID;

- Individuals dress inappropriately for their age or have lower quality clothing compared to others in their party;

- Individuals have few or no personal items—such as no luggage or other bags;

- Individuals appear to be with a significantly older "boyfriend" or in the company of older males;

- A group of girls appears to be traveling with an older female or male;

---

[6] United States Department of Homeland Security Blue Campaign – One Voice. One Mission. End Human Trafficking, https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf (last visited April 13, 2023); National Center for Missing and Exploited Children, https://www.missingkids.org/theissues/trafficking#riskfactors (last visited April 13, 2023); Love 146, *Red Flags for Hotel & Motel Employees*, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf (last visited April 13, 2023); Texas Attorney General, *Human Trafficking Red Flags*, https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf (last visited April 13, 2023).

[7] *See Id.*

- A group of males or females with identical tattoos in similar locations. This may indicate "branding" by a trafficker;

- Drug abuse or frequent use of "party drugs" such as GHB, Rohypnol, Ketamine, MDMA (Ecstasy), Methamphetamines, Cocaine, and Marijuana;

- Possession of bulk sexual paraphernalia such as condoms or lubricant;

- Possession or use of multiple cell phones; and

- Possession or use of large amounts of cash or pre-paid cards.

17.     Choice's statements regarding trafficking confirm they are aware of the trafficking problem in the hospitality industry. Recognizing the unique vantage point that hotels and their staff often have to identify human trafficking ventures and victims on their properties, several major hotel chains, including franchisors, franchisees, and owner/operators, have told the public they have accepted the unique opportunity and responsibility to stop facilitating sex trafficking. For example:

- Choice's Board of Directors has been discussing human trafficking issues since at least 2008 when it adopted a Human Rights Policy that condemns human trafficking and publicly commits to raising awareness among hotel staff about trafficking in its hotels.[8]

- Choice claims that it started supporting Polaris, a leading non-profit in the fight against trafficking, in 2010.[9] Upon information and belief, prior to K.S.'s trafficking period, Choice had reviewed and was familiar with Polaris publications regarding the hospitality industry, which include detailed recommendations for how hotels can respond to trafficking.

- In November 2010, Defendant Choice publicly claimed it was partnering with ECPAT-USA to develop a training module to educate its management and staff in the prevention of sex trafficking.[21]

---

[8] https://www.choicehotels.com/about/responsibility/human-rights-policy
[9] https://www.choicehotels.com/about/responsibility/human-rights-policy
[21] See Choice Hotels, Human Rights Policy, available at

https://www.choicehotels.com/about/responsibility/human-rights-policy; see also ECPAT-USA, Tourism Protection Code of Conduct, available at http://www.ecpatusa.org/code/

18.    Choice had a duty to and assumed the responsibility to identify potential sex trafficking at its branded hotels and not to facilitate the trafficking.

19.    Each and every Defendant named herein had the opportunity and responsibility to adopt, effectively implement, and enforce reasonable and effective policies at the subject Econo Lodge to detect and stop the facilitation of sex trafficking. Unfortunately for C.J. the Defendants' promises proved empty. Such policies were not in place or were inadequately enforced at the Econo Lodge.

20.    Instead, Defendants adopted, enforced, and continued to implement policies and protocols that they knew or should have known were facilitating sex trafficking and failing the victims of sex trafficking at their hotel(s) including at the Econo Lodge. Defendants have failed, at all levels, to take appropriate and effective action in response to their knowledge of widespread and ongoing human trafficking in their hotels. Instead, they have continued financially benefiting by providing venues for the sexual exploitation of victims like C.J.

**The Use of Econo Lodge Branded Properties for Sex Trafficking is Prevalent**

21.    The use of Econo Lodge hotels for sex trafficking is well known to Defendants. Defendants have known for years that pimps and traffickers use their hotels to carry out their crimes. Scores of news stories dating back for over a decade highlight Defendants' knowledge of such conduct.  Here is a sample of such news stories:

- February 23, 2011 – a news article reported that Albuquerque police discovered a prostitution ring operating out of the Econo Lodge at 25 Hotel Circle in Albuquerque, New Mexico.[10]

- August 29, 2011 – a news article reported that in August 2011 police in Lima, Ohio made two different prostitution related arrests at the Econo Lodge at 1210 Neubrecht Road, Lima, Ohio.  One of the men arrested was the Mayor of the City of Ottawa, Ohio.[11]

---

[10] "APD: Robbery Call Leads to Prostitution Ring," Albuquerque Journal, (Feb. 23, 2011)
[11] "Ottawa Mayor arrested for solicitation, Times Bulletin," (Aug. 29, 2011).

- October 21, 2011 – a news article reported that a police officer and a woman were both arrested on charges of prostitution at the Econo Lodge on Two Notch Road in Columbia, South Carolina.[12]

- November 19, 2011 – a news article reported that a New York woman was arrested on four counts of prostitution and two counts of fourth-degree sex offense at the Econo Lodge in Fredrick, Maryland.[13]

- February 26, 2012 – a news article reported that a man was tried for forcing a 17 year old girl into prostitution and trafficking her at various locations including the Econo Lodge on Northeast Sandy Boulevard, Portland, Oregon.[14]

- May 25, 2012 – a news article in the Detroit Legal News reported that two men charged with sex trafficking operated out of the Econo Lodge near Interstate 35 in Des Moines, Iowa.[15]

- August 2, 2012 – a news article reported that police made a prostitution related arrest at the Econo Lodge on 9th Avenue South, Fargo, North Dakota.[16]

22.     These and other news stories show that the use of Econo Lodges for sex trafficking was not isolated to one Econo Lodge or geographic area and the common use of Econo Lodge for sex trafficking turned into a nationwide problem that stemmed from decisions at the top.

23.     Similarly, Franchisors knew sex trafficking was occurring at their hotels through publicly available online review websites, which are regularly reviewed by companies such as Choice Hotels International, Inc. and Choice Hotels International Services Corp.  Here is a sample of such reviews:

---

[12] "Columbia police officer facing prostitution charges," WACH Fox News Center, (Oct. 21, 2011).

[13] "N.Y. woman faces prostitution charges in Fredrick," WTOP News, (Nov. 19, 2011).

[14] "Portland trial offers rare look at the life of a teenaged prostitute – and how Internet sex ads enriched pimp," The Oregonian, (Feb. 26, 2012)

[15] Ryan J. Foley, "Iowa Feds: Sex trafficking ring used Backpage.com ads Indictment says 27-year-old New Jersey man acted as pimp," Detroit Legal News (May 25, 2012)

[16] "Fargo police arrest 2 johns in prostitution sting," INFORM, (Aug. 2, 2012).

- In December 2007 – regarding a Portland, Oregon Econo Lodge, a reviewer wrote, "The neighborhood was very seedy - there were drug dealers and prostitutes (no joke.)."[17]

- In September 2008 in a review titled, "Stay Away from this hotel – smells of uring & reeks of prostitution," a reviewer wrote of a Queens, New York Econo Lodge, "…this place is frequented by johns and prostitutes…the staff rent rooms in low increment hours to people who live in the neighborhood (what does that tell you?)…."[18]

- In July 2008, regarding a Queens, New York Econo Lodge, in a review titled, "Warning – Hooker Hotel," a reviewer wrote, "[b]eware - this is a place that rents out to hourly clients. The neighborhood is worse than sketchy, the vending machine sells condoms/lube."[19]

- In September 2008 – regarding a Queens, New York Econo Lodge, in a review titled, "Stay Away from this hotel – smells of uring & reeks of prostitution," a reviewer wrote, "…this place is frequented by johns and prostitutes…the staff rent rooms in low increment hours to people who live in the neighborhood (what does that tell you?)…."[20]

- In March 2010 - regarding a Roanoke Rapids, North Carolina Econo Lodge, in a review titled, "A visit from prostitutes!!!!!," a reviewer wrote, "[t]he room was nasty as everyone has stated but the best part was when the police arrived as we carried our kids to the room. They said there was a prostitution ring raid! Then as we tried to fall asleep a loud persistent bang on the door from a prostitute stating she was "ready for you."[21]

- In August 2010 – regarding a Klamazoo, Michigan Econo Lodge, a reviewer wrote, "[f]irst of all a week before he arrived the place was busted for having a meth lab running out of one of the rooms. You can get the full story from the two prostitutes living there if you would like. The pool was disgusting and had dirt on the bottom. One of the rooms that his work partner was assigned to found envelopes of crack just under the bed…."[22]

---

[17] https://www.tripadvisor.com/ShowUserReviews-g52024-d102057-r11939232-Econo_Lodge_Portland_I-Portland_Oregon.html

[18] https://www.tripadvisor.com/ShowUserReviews-g48355-d1063141-r20484077-Econo_Lodge-Ozone_Park_Queens_New_York.html.

[19] https://www.tripadvisor.com/ShowUserReviews-g48355-d1063141-r18019248-Econo_Lodge-Ozone_Park_Queens_New_York.html

[20] https://www.tripadvisor.com/ShowUserReviews-g48355-d1063141-r20484077-Econo_Lodge-Ozone_Park_Queens_New_York.html.

[21] https://www.tripadvisor.com/ShowUserReviews-g49653-d8463329-r59253516-Econo_Lodge_Weldon_Roanoke_Rapids-Weldon_North_Carolina.html.

[22] https://www.tripadvisor.com/ShowUserReviews-g42354-d95132-r74913064-Econo_Lodge-Kalamazoo_Kalamazoo_County_Michigan.html

8

- In February 2011 – regarding an Orlando, Florida Econo Lodge, a reviewer wrote, "[d]on't be fooled by the pictures, this hotel is BAD. First, it is located in a bad area...appears to be a good area during the day, but dealers, pimps, and hookers out at night."[23]

- In June 2011 – regarding a Portland, Oregon Econo Lodge, in a review titled, "Ant infestation, pet hair, meth addicts in the lobby," a reviewer wrote, "[t]his was probably the worst motel experience I've ever had, and I have stayed in a lot of lower budget places in my life…we arrived exhausted after a long drive, so at first the sketchy folks hanging around the lobby didn't really register with us…coming back from picking up food, my husband and housemate spotted a couple of obvious prostitutes doing business in the parking lot and got accosted by some strung out woman who asked if she could come stay in our room with us." Through Econo LodgePDX, the manager responded saying, "authorities have agreed to routinely patrol our parking lot throughout the night." [24]

- In April 2012 – regarding a Orlando, Florida Econo Lodge, a reviewer wrote, "…we say a hooker leaving the hotel on our way back from dinner…."[25]

- In June 2012 – regarding a Sacramento, California Econo Lodge, a reviewer wrote, "[t]he rooms were so dirty we went out & bought lysol wipe everything down. The breakfast gave everyone the runs. That's not even the worst part!! There drug deals & hookers that hang out outside!!!!!!"[26]

- In July 2012 – regarding a Sacromento, California Econo Lodge, a reviewer wrote, "…there was this guy… staring at me and my friend as we were switching rooms and trying to follow us. There were also some hookers and drug dealers across the street staring at us."[27]

- In July 2012 – regarding a Sacromento, California Econo Lodge, a reviewer wrote, "…[I] saw no questionable activities, even though the room was on the back side of the motel,

---

[23] https://www.tripadvisor.com/ShowUserReviews-g34515-d601616-r97862372-Econo_Lodge_Inn_and_Suites_Near_Florida_Mall-Orlando_Florida.html.

[24] https://www.tripadvisor.com/ShowUserReviews-g52024-d96111-r111312690-Econo_Lodge_Portland_Airport-Portland_Oregon.html

[25] https://www.tripadvisor.com/ShowUserReviews-g34515-d601616-r127623225-Econo_Lodge_Inn_and_Suites_Near_Florida_Mall-Orlando_Florida.html.

[26] https://www.tripadvisor.com/ShowUserReviews-g32999-d227106-r132697645-Studio_6_Sacramento_CA_Natomas-Sacramento_California.html

[27] https://www.tripadvisor.com/ShowUserReviews-g32999-d227106-r133400266-Studio_6_Sacramento_CA_Natomas-Sacramento_California.html

where the drug dealers and hookers are reported to hang out." Quality Sacremento, General Manager responded but did not address drug dealing or prostitution.[28]

- In August 2012 – regarding an Akron, Ohio Econo Lodge, in a review titled, "DISGUSTING," a reviewer wrote, "…we were greeted by a used condom at the front of the hotel…."[29]

- In December 2012 – regarding a Yuba City, California Econo Lodge, a reviewer wrote, "I felt so unsafe there, I checked out within the hour. The clerk at the hotel across the way told us the Econo Lodge was known for being a place of drug deals and prostitution." Loren A, General Manage responded but did not address drug dealing or prostitution.[30]

- In December 2012 – regarding an Elizabeth, New Jersey Econo Lodge, a reviewer wrote, "…I woke up to a very suspicious noises coming through a paper-thin wall from a room next door. My next door neighbor obviously…used both - booze and sex in abundance. So first there was some loud animal- like lovemaking like in a bed porno movie…I fell asleep only around 2 am completely exhausted only to wake up around 4 am to hear someone trying to open my door…and I heard somebody slurring the words:"Ooops. Wrong room. Sorry."[31]

- In January 2013 – regarding an Austin, Texas Econo Lodge, a reviewer wrote, "[h]otel near high crime rate area St Johns and cameron road. Somehow they tie in with Bikini Restuarant which is in front of hotel on the same lot and they advertise Bikinis in their rooms. I know in the news just yesterday or day before they busted a girl there for prostitution in a police sting."[32]

24.    Moreover, each Defendant knew or should have known about the widespread and ongoing trafficking at the Econo Lodge specifically. Upon information and belief, traffickers repeatedly and intentionally chose to use the Econo Lodge for their sex trafficking activity because they knew that members of the staff looked the other way, because the policies and practices of

---

[28] https://www.tripadvisor.com/ShowUserReviews-g32999-d227106-r134074565-Studio_6_Sacramento_CA_Natomas-Sacramento_California.html

[29] https://www.tripadvisor.com/Hotel_Review-g50236-d278078-Reviews-Econo_Lodge_Akron-Copley_Ohio.html

[30] https://www.tripadvisor.com/ShowUserReviews-g33302-d81000-r146659863-Econo_Lodge_Inn_Suites_Yuba_City_Marysville-Yuba_City_California.html.

[31] https://www.yelp.com/biz/econo-lodge-motel-elizabeth

[32] https://www.tripadvisor.com/ShowUserReviews-g30196-d220106-r150047456-Econo_Lodge_North_Austin-Austin_Texas.html

10

the hotel facilitated their trafficking, and because of the access and security the hotel provided. These traffickers repeatedly interacted with the staff of Econo Lodge. The signs of this widespread sex trafficking were obvious, and the hotel staff knew about this activity or was willfully blind to it.

25.    Each Defendant knew of the sex trafficking crisis prevalent in the hotel industry generally, as well as specifically at Econo Lodge branded hotels, including the subject hotel, and while Defendants claim not to tolerate such activity, the evidence shows and will show at trial that sex trafficking continued at the subject Econo Lodge frequently and long after the trafficking of the Plaintiff.

**C.J. Was Trafficked at the Econo Lodge**

26.    One of the lives devalued and otherwise adversely affected by Defendants' inattention to the prevention and eradication of sex trafficking was C.J.

27.    From approximately April through May 2013, C.J. was repeatedly trafficked for sex at the Econo Lodge located at 853 Spring St., Elizabeth, NJ 07201.

28.    The hotel rooms in which C.J. was trafficked were frequently paid for with cash.

29.    Other girls were being trafficked at the same hotel at the same time as C.J.

30.    One of the hotel employees gave C.J. and the other girls pepper spray and told them to stay safe.

31.    There was also heavy foot traffic in and out of C.J.'s room involving men who were not hotel guests. These individuals entered and left at unusual hours and were present at the hotel for brief periods of time, which are signs of sex trafficking that hotel staff observed.

32.    There were other signs of C.J..'s trafficking while at the Econo Lodge, consistent with the *modus operandi* used by C.J.'s trafficker, that were observed by hotel staff, which are consistent with the "red flags" for trafficking

33.    The staff and management of the Econo Lodge knew or were willfully blind to the fact that C.J. was being trafficked.

34.    Because policies purportedly enacted and enforced by Choice to identify signs of sex trafficking and stop it from occurring were not properly implemented at the Econo Lodge by either Defendant Choice or Franchisee, C.J.'s trafficker was able to continue the trafficking venture at the Econo Lodge. Had Defendant Choice enforced the policies and procedures they enacted to prevent trafficking from occurring within their Econo Lodge branded hotels after observing an obvious sign of trafficking as described above, C.J.'s trafficking would have been identified and reported, which would have prevented her trafficking at the Econo Lodge. Furthermore, had Franchisee properly followed the franchise policies enacted by Choice to identify and prevent trafficking from occurring at Econo Lodge branded hotels as described above, C.J.'s trafficking would have been identified and reported, which would have prevented her trafficking at the Econo Lodge.

35.    Upon information and belief, each of the Defendants knew or should have known about the widespread and ongoing trafficking at Econo Lodge, including the trafficking of C.J., because of information available through numerous channels, including but not limited to:

- Franchisee's monitoring and supervision of the Econo Lodge;
- Franchisee's direct presence on-site at the Econo Lodge;
- Collection and review of surveillance footage from the Econo Lodge by;
- Choice's protocol that, on its face, required staff of the Econo Lodge and Franchisee to report suspected criminal activity and suspected trafficking to Choice;
- Choice's regular, unannounced inspections of the Econo Lodge;

- Information obtained by Choice's field-based associates that visited hotels, including the Econo Lodge, to discuss trafficking. to discuss human trafficking issues;[33]
- Franchisee and Choice's joint involvement in soliciting, monitoring, analyzing, and responding to guest surveys and guest complaints;
- Choice's capture, retention, and analysis of extensive data about all aspects of the operation through the backend of systems it required Franchisee to use at the Econo Lodge.

36.    Despite obvious signs of human trafficking and indicators of commercial sex activity, Defendants failed to recognize, stop, or report the venture occurring on the premise that resulted in C.J.'s trafficking and consequently, actively facilitated the trafficking venture. The Defendants harbored or otherwise facilitated a sex trafficking venture on their hotel properties and accordingly, benefited, financial and otherwise, from the sex trafficking the Plaintiff suffered. Furthermore, the Defendants failed to prevent her continued victimization.

37.    Defendants continued to allow illegal activities, including prostitution, to occur at the subject Econo Lodge, according to internet reviews.

- Yelp review from July 24, 2013 stating "I can't believe that such a place exists in America. It is astounding that people in a first world country can live like this. I felt safer in Afghanistan. Good-lord, what a dump-hole! I think this is a motel for cheap prostitutes and drug dealers only. My wife made the mistake of pre-paying for the room ($120.00) at the airport, and when we arrived, took one look at this horrible place and tried to get our money back 30 minutes later, they refused. Unless you are looking to smoke crack with an HIV-infected prostitute who will probably stab you, you don't want to stay here."[34]

38.    Defendants, acting by and through their agents, managers, vice-principals and employees, did not act to reduce or eliminate the human sex trafficking in the subject Econo Lodge, despite the obvious signs of sex trafficking and commercial sex taking place there because said Defendants were actively engaged in facilitation of and benefiting from said activities.

---

[33] https://www.choicehotels.com/about/responsibility/human-rights-policy
[34] https://www.yelp.com/biz/econo-lodge-motel-elizabeth

13

39.    Defendants also had constructive knowledge of C. J's trafficking because it resulted from their facilitation of widespread and ongoing trafficking at the Econo Lodge.

**Franchisee Was Required to Report to the Franchisor, Choice**

40.    The relationship between Franchisee and Choice, as franchisor, was governed by a franchise agreement.

41.    Franchisee provided the "boots on the ground" for the operation of the Econo Lodge.

42.    At all material times, Choice had robust reporting requirements in place for Franchisee.

43.    Choice requires its franchisees, such as Franchisee, to report all suspected instances of crime at Econo Lodge branded properties.

44.    Based on information observed by the staff at the subject Econo Lodge, reports were or should have been made to Defendant Choice about the sex trafficking of C.J.

**Franchisee and the staff of the Econo Lodge were actual agents of Choice.**

45.    Defendant Choice exercised pervasive and systematic control over Franchisee.

46.    Defendant Choice exercised an ongoing and systemic right of control over Franchisee regarding the operation of the subject Econo Lodge.

47.    Choice is vicariously liable for the acts, omissions, and knowledge of Franchisee and the staff at the Econo Lodge, which are Choice's actual agents or subagents.

**48.**    At all relevant times, Choice subjected to detailed standards and requirements regarding the operation of the Econo Lodge through the franchise agreement through detailed written policies and manuals, and through other formal and informal protocols, directives, mandates, and expectations imposed by Choice. These written standards, protocols, and requirements:

- did not merely identify quality or outcome standards but instead specifically controlled the means, methods, and tools used at the Econo Lodge; and

- covered virtually all aspects of hotel operations, including internal operating functions; and

- dictated the specific manner in which Franchisee and hotel staff must carry out most day-to-day functions at the Econo Lodge; and

- significantly exceeded what was necessary for Choice to protect its registered trademarks and comply with the Lanham Act.

49.     Choice required its franchisees, such as Franchisee Defendants, to allow Choice to regularly inspect its Econo Lodge branded hotels.

50.     Choice regularly inspected the Econo Lodge.

51.     One of Choice's most valuable assets is its brand.

**52.**     In addition to the ways described above, upon information and belief, Choice exercised and reserved the right to exercise systemic and pervasive control over Franchisee's day-to-day operation of the Econo Lodge in ways including but not limited to the following:

- Choice required Franchisee and management of the Econo Lodge to participate in mandatory training programs, both during onboarding and on an annual basis, regarding all aspects of hotel operations, including aspects of hotel operations that go significantly beyond what would be necessary for Choice to protect its trademarks.

- Choice retained the right to mandate and control training for hotel staff and actually maintained and controlled training for hotel staff on topics it selected.

- Choice controlled the details of training conducted for hotel staff by Franchisee by requiring the use of standardized training methods and materials, including developing online, role-specific training that Franchisee was required to use.

- Choice adopted detailed job descriptions for each position at the Econo Lodge and drafted numerous, detailed policies that referenced these positions and dictated which positions must perform which tasks and how they must do so.

- Choice set required staffing levels for the Econo Lodge

15

- Choice exercised significant control over the procurement decisions of Franchisee by requiring it to buy products from "qualified vendors" and limiting its ability to purchase products from other vendors.

- Choice imposed and enforced detailed requirements for all aspects of hotel facilities.

- Choice controlled channels for guests to report complaints or provide feedback regarding the Econo Lodge and directly participated in the response and/or supervised and dictated Franchisee's response to customer complaints or other feedback.

- Choice required the Econo Lodge to participate in a mandatory guest complaint resolution system operated, managed, and overseen by Choice.

- Choice required Franchisee to join and participate in a franchisee association with other Choice brand hotels.

- Choice controlled all marketing for the Econo Lodge, including all website pages, and prohibited Franchisee from using any website, social media, advertising, or other public communication without written approval from Choice.

- Choice required Franchisee to refer all guests who it could not accommodate to other Choice-branded hotels.

- Choice required Franchisee to purchase insurance and set specific requirements for that insurance.

- Choice imposed detailed recordkeeping and reporting requirements on Franchisee regarding virtually all aspects of hotel operation.

- Choice collected, monitored, and analyzed dozens of reports regarding the Econo Lodge through the backend of the ChoiceADVANTAGE property management system and used these reports to supervise and control the day-to-day operations of the Econo Lodge.

- Choice collected, monitored, and analyzed guest information in two separate systems: the CIS (Customer Information System) and the GIS (Guest Insight System) through the backend of the ChoiceADVANTAGE property management system and used this information to supervise, monitor, manage, and control the day-to-day operations of the Econo Lodge.

- Choice retained the virtually unlimited right to supervise the day-to-day operations of the Econo Lodge by retaining the right to implement any automatic reporting systems it elected to use.

- Choice retained the virtually unlimited right to revise policies or adopt new requirements for the day-to-day aspects of hotel operations.

- Choice retained the right to inspect the Econo Lodge, including through unannounced inspections.

16

- Choice retained the right to impose penalties, including but not limited to written warnings, payment of re-inspection, non-compliance, and guest satisfaction fees, attendance at mandatory training programs and ultimately to the termination of the franchise agreement, on Franchisee for violations of any rule, policy, or standard promulgated by Choice.
- Other actions that deprived Franchisee Defendants of independence in the business operations of the Econo Lodge.

53. Choice specifically retained control over the day-to-day operation of Franchisee with regard to aspects of operation of the Econo Lodge that caused C.J.'s harm, including but not limited to reservation policies and procedures, staff training, security policies, and training, education polices, and procedure regarding human trafficking.

54. Choice regularly advised Franchisee on operational changes necessary for it to remain in compliance with Choice's strict regulations.

55. Choice had the ability to impose fees or fines on Franchisee Defendants. Furthermore, at all material times, Choice retained an absolute right to cancel its franchise agreement with Franchisee if Choice's rules were violated or if Franchisee otherwise failed to comply with its contractual obligations.

56. At all relevant times, Franchisee acted as the agent of Defendant Choice when operating the subject Econo Lodge.

57. Choice and Franchisee Defendants shared control of the terms and conditions of the employment of staff at the subject Econo Lodge and, therefore, Defendant Choice and Franchisee Defendants are joint employers. Upon information and belief, Defendant Choice exercised control over the terms and conditions employment of staff at the subject Econo Lodge.

58. Therefore, as a result of the strict reporting requirements, at all material times, each and every Defendant knew or should have known of their facilitation of sex trafficking at the Econo Lodge, including the facilitation of the sex trafficking of C.J.

17

**C.J.'s Trafficking Could Have Been Prevented at the Econo Lodge**

59.    At all material times, each and every Defendant owned, operated, managed, supervised, controlled, and/or was responsible for the operations of the Econo Lodge.

60.    Franchisee and Choice acted jointly to rent rooms at the Econo Lodge.

61.    Franchisee participated in the rental of rooms through providing on-site boots on the ground at the front desk of the Econo Lodge.

62.    Franchisee is responsible for the acts, omissions, and knowledge of all employees of the Econo Lodge because:

- These acts and omissions were committed in the scope and course of employment.

- Franchisee ratified these acts and omissions.

- Franchisee failed to exercise reasonable care with regard to the hiring, training, and supervision of these employees given the specific risks, known to Franchisee, of human trafficking, occurring at the Econo Lodge.

63.    Choice  directly participated in the rental of rooms at the Econo Lodge in ways including but not limited to:

- Choice controlled all details of the guest reservation, check-in, and payment processes through its management of and control over all systems used for those processes and through its adoption and enforcement of detailed and specific policies dictating the means and methods used for the day-to-day implementation of these processes.

- Choice directly took reservations for rooms at the Econo Lodge and accepted payment for those rooms through a central reservation system ("CRS") that it controlled and operated. This CRS included a toll-free telephone reservation system, a proprietary internet site, mobile phone and tablet reservation applications, and interfaces with global distribution systems and other internet reservation sites.

- Choice could make reservations and take payment for rooms at the Econo Lodge without any involvement or approval by Franchisee.

- Choice directly entered into agreements with third parties regarding the distribution of room inventory in its branded hotels, including its franchised hotels.35

- When a guest did not make a reservation in advance through the CRS, Choice nonetheless controlled the specific process used to register a walk-in guest and generate a reservation for that guest.36

- Choice set or otherwise controlled room prices, required discounts, and reward programs. Choice also controlled the room rates offered to each guest.37

- Choice controlled all data related to room rentals; every time someone makes a reservation, checks in, or checks out, the transaction goes directly through Choice's data center.38

- Choice controlled and restricted the ability of Franchisee and hotel staff to refuse or cancel a reservation.

- Choice established detailed policies and protocols that dictated, step-by-step, everything that would happen from the time a guest arrived at the Econo Lodge until they entered their guest room. This included operational directives regarding payment methods, identification requirements, the number of guests that could be in each room and whether information needed to be collected for each guest, what questions hotel staff should and should not ask, and other matters related to check-in.

- Choice required Franchisee to use the ChoiceADVANTAGE property management system, which was owned, maintained, and controlled by Choice, for virtually all aspects of hotel operations related to room rentals. Through the backend of this system, Choice exercised control over day-to-day processes.

- Choice maintained back-end access to the ChoiceADVANTAGE property management system, which it used to collect, track, and report comprehensive information about each guest at the Econo Lodge.

- Choice also participated in day-to-day operations regarding reservations by synchronizing the rate and inventory information for the Econo Lodge with the CRS and making day-to-day decisions about rates.

64.     Even though the hotel staff knew or was willfully blind to their trafficking activities, the hotel staff continued associating with sex traffickers, including C.J.'s trafficker, by

---

35 https://www.sec.gov/Archives/edgar/data/1046311/000104631117000006/chh1231201610-k.htm
36 https://www.choiceadvantage.com/cA_Functionality.pdf
37 https://www.choiceadvantage.com/cA_Functionality.pdf
38 https://www.raritan.com/resources/case-studies/detail/no-sleepless-nights-for-choice-hotels-data-center-team

renting rooms, accepting cash, ignoring obvious sex trafficking signs and taking other steps to facilitate trafficking activities.

65.    Choice and Franchisee continued renting rooms and providing related services to traffickers whom it knew or should have known were engaged in sex trafficking. In doing so, each Defendant formed an association in fact with the traffickers operating at the subject Econo Lodge who chose the hotel because the acts and willful or negligent omissions of each Defendant made it a favorable venue for sex trafficking.

66.    C.J.'s trafficker chose the Econo Lodge for the purpose of trafficking C.J. for sex because the manner in which the hotel was operated allowed his illegal activity to proceed without interference and with minimal traceability.

67.    Each of the Defendants knew or should have known that C.J. was being trafficked and, despite this, continued associating with her traffickers by providing hotel rooms and related services, for her sexual exploitation.

68.    Defendants were jointly responsible for customer safety and, specifically, prevention of human trafficking at the Econo Lodge.

69.    Defendant Choice retained control over, and thus had a duty with respect to, customer safety at the Econo Lodge generally and specifically regarding detection of and response to human trafficking at the Econo Lodge, including by:

- Choice retained control over and responsibility for training related to detecting and responding to human trafficking at the Econo Lodge.
- Choice retained control over and responsibility for setting, supervising, overseeing, and enforcing all policies and protocols regarding detecting and responding to human trafficking at the Econo Lodge,
a. Choice was responsible for maintaining, monitoring, and analyzing patterns of criminal activity in franchised hotels including the Econo Lodge.
b. Choice assumed responsibility for distributing safety-related information to franchisees and hotel staff, including pushing information to the Econo Lodge

through website and software portals that hotel management and staff were required to use when performing day-to-day job functions.

    c.   Choice assumed responsibility for monitoring circumstances and events associated with a high risk of trafficking and notifying franchisees and hotel staff of the same.[39]

- Choice retained control over the setting, supervision, overseeing, and enforcement of detailed policies and protocol for housekeeping services at the Econo Lodge, including policies for how often rooms must be entered, how to respond to guest refusals of entry into rooms, and steps to monitor guest safety issues through housekeeping services.

- Choice collected, maintained, and analyzed detailed data regarding housekeeping services at the Econo Lodge, including trends that would reveal patterns consistent with human trafficking.

- Choice maintained control over all aspects of internet services provided at the Econo Lodge, including whether it was provided, how it was provided, and detailed policies regarding guest use of that wi-fi, such as policies on blocking of sites and tracking or monitoring guest use of wi-fi for improper purposes, such as promoting the services of sex trafficking victims.

70.    Armed with knowledge of the prevalence of trafficking in the hotel industry, at Econo Lodge hotels across the country, and the signs present at the subject Econo Lodge, each and every Defendant had an obligation to enact, implement, follow, and enforce policies to identify sex trafficking and not to participate in or benefit from the facilitation thereof. Each and every Defendant failed to do so and thus facilitated sex trafficking that operated out of Econo Lodge.

71.    The most effective weapon against sexual exploitation and human trafficking is education and training.[40] As ECPAT concluded:

The hospitality industry is in a unique position to identify and report human trafficking due to its perceived anonymity. Traffickers believe they can go unnoticed while exploiting victims across the globe in hotels— ranging from budget properties to luxury resorts. From check-in to check-out there are a number

---

[39] https://www.choicehotels.com/about/responsibility/human-rights-policy
[40] Polaris, *Recognizing Human Trafficking*, https://polarisproject.org/recognizing-human-trafficking/ (last visited April 13, 2023).

21

of indicators victims and exploiters exhibit during the time they are on a hotel property.[41]

72.     This same conclusion is echoed by others who seek to eliminate or minimize sex trafficking in the hospitality industry, including the American Hotel Lodging Association: "Hotel employees who have undergone training are more aware of trafficking when it happens – and are more willing to report it – than those who have not been trained.[42] In reference to companies like the Defendants, ECPAT observed: "If they do nothing to raise awareness or to prevent child trafficking, they risk becoming an indirect and unintentional conduit for the abuse that takes place."

73.     If the Defendants had adequately trained and implemented guidelines, "red flags," training policies and procedures, and other recommendations adopted in the industry, each and every Defendant would have or should have known of C.J.'s trafficking at the Econo Lodge and would have been in a position to prevent the trafficking of C.J.

74.     The "red flags" and signs of a sex trafficking venture described above were observed by Franchisee Defendants. Upon information and belief, Franchisee Defendants should have reported the signs of sex trafficking to Defendant Choice.

75.     Had each and every Defendant educated and/or trained their actual or apparent agents, servants, franchisees, employees and/or staff regarding human trafficking and their warning signs, their actual or apparent agents, servants, franchisees, employees and/or staff would have more aware of human trafficking taking place at their hotels, including the Econo Lodge, and

---

[41] ECPAT USA, *Training for Hotel Associates*, https://www.ecpatusa.org/hotel-training (last visited April 13, 2023). *See also* Carolin L. et al., *Sex Trafficking in the Tourism Industry*, J. Tourism Hospit. (2015), https://www.longdom.org/open-access/sex-trafficking-in-the-tourism-industry-2167-0269-1000166.pdf.
[42] AHLA, *Free Online Training*, https://www.ahla.com/issues/human-trafficking (last visited April 13, 2023).

could have, at best, prevented it from happening or, at worst, been more willing to report it when it happened.

76.    Each and every Defendant's active decision not to prevent and stop sex trafficking and sexual exploitation at their hotels, including the Econo Lodge, makes them accountable to victims of sex trafficking, including the Plaintiff C.J.

77.    Thus, each and every Defendant engaged in acts and omissions that supported, facilitated, harbored, and otherwise furthered the trafficker's sale and victimization of C.J. for commercial sexual exploitation. More specifically, the Defendants rented rooms to C.J.'s trafficker, permitted their illicit enterprise to operate on an ongoing and repetitious basis, and took no action to abide by Choice's own self-imposed anti-trafficking measures. This and related behavior by Defendants provide an ample basis to conclude that they participated in the venture that trafficked C.J.

78.    Upon information and belief, Choice continued participating in a venture at the Econo Lodge with Franchisee and with hotel staff in a way that it knew or should have known would lead to additional sex trafficking, in ways including but not limited to the following:

- In November 2010, Defendant Choice partnered with ECPAT-USA to develop a training module to educate its management and staff in the prevention of sex trafficking.[21] However, Defendant Choice did not enforce the program, or require its employees to complete this training, or even follow up to make sure that Econo Lodge branded hotels were following the protocols.

- Choice adopted inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining franchisees and front-line hotel staff regarding issues related to human trafficking.

- Choice implicitly condoned and endorsed the franchisee's repeated decisions not to report or respond to trafficking appropriately.

---

[21] See Choice Hotels, Human Rights Policy, available at https://www.choicehotels.com/about/responsibility/human-rights-policy; see also ECPAT-USA, Tourism Protection Code of Conduct, available at http://www.ecpatusa.org/code/

- Choice continued to use policies, protocols, and practices that had been shown to lead to widespread trafficking at the Econo Lodge.

- Choice deviated from and disregarded stated policies when operating the hotel.

- Choice attracted traffickers by affirmatively creating a favorable venue where access was easy, risks of interference were low, and traceability was minimal.

- Choice allowed traffickers to reserve rooms using cash, which provided relative anonymity and non-traceability.

- Choice provided access to high volumes of unregistered guests all going into the same room without logging these guests or requiring identification.

- Choice continued to allow the hotel to use its trademarks despite actual or constructive knowledge of ongoing sex trafficking in that hotel.

- Choice provided traffickers with access to internet services that Choice knew or should have known would be used to facilitate trafficking by promoting commercial sex services online.

79.     The motivation behind each and every Defendant's ongoing willful blindness and ongoing failure to act is plain and simple – limitless corporate greed; each and every Defendant ignored all of the signs of and/or solutions to human trafficking out of an unfettered fealty to their profit margins and a corresponding complete disregard for the value of human life.

**Each Defendant Knowingly Benefitted from C.J.'s Sex Trafficking**

80.     Plaintiff alleges that each of the Defendants knowingly received benefits from participating in the venture that facilitated C.J.'s trafficking at the Econo Lodge.

81.     As a result of the strict reporting requirements at all material times, Defendants knew they were both facilitating and benefitting from sex trafficking at the Econo Lodge including the sex trafficking of C.J.

82.     Choice, as franchisor, generates substantial income from operations of hotels such as the Econo Lodge. In exchange for providing the services described above and more specifically delineated in the controlling franchise agreement, Choice received a share of the profits from room

24

rentals collected by Franchisee at the Econo Lodge. The primary source of Choice's income is the franchising royalty fee, but Choice also profits from reservation fees, marketing fees, loyalty program fees, and other miscellaneous ancillary fees, as described in the franchise documents. The fees generated by Choice are primarily based on gross room rentals; therefore, Choice's profits increase with each room rental.

83.     Franchisee profited from every stay by every patron at the Econo Lodge, both from room rentals and other hotel services.

84.     Upon information and belief, Choice knowingly benefitted from its participation in the sex trafficking venture carried on at the Econo Lodge in that it received a portion of the proceeds collected by its franchisee.

85.     Therefore, at all material times, Defendant Choice and Franchisee received monetary payment for the rental of rooms at the Econo Lodge, including the rooms where C.J. was being trafficked.

86.     Despite knowledge of the sex trafficking venture occurring at Econo Lodge, both Franchisee and Defendant Choice continued to financially benefit from C.J.'s stay at located at the Econo Lodge, all while doing nothing to prevent or stop criminal activity-sex trafficking, including the trafficking of C.J., from occurring on their property.

87.     As a result of the monies paid by C.J.'s trafficker to the secure rooms for her trafficking at the Econo Lodge, Choice and Franchisee knowingly benefitted from participating in the venture that trafficked, harbored, and maintained C.J.'s trafficking at the Econo Lodge.

**88.**     Through the conduct described above, Defendants knowingly benefited from engaging in a venture with sex traffickers at the subject Econo Lodge including C.J.'s traffickers, as follows:

a. Choice and Franchisee both received benefits, including increased revenue, every time a room was rented at the Econo Lodge.

b. This venture engaged in violations of 18 U.S.C. §1591 through the actions of the criminal traffickers at the Econo Lodge, which each Defendant knew or should have known about.

c. Defendants associated with traffickers, including C.J.'s traffickers, by acting jointly to continue to rent rooms to these traffickers despite having actual or constructive knowledge of their sex trafficking activity.

d. Defendants had a mutually beneficial relationship with the traffickers at the Econo Lodge, fueled by sexual exploitation of victims.

e. Sex traffickers, including C.J.'s traffickers, frequently used the Econo Lodge for their trafficking because of an implicit understanding that hotel was a venue that would facilitate their trafficking, providing minimal interference and lowering their risk of detection. This understanding occurred because of the conduct of Defendants facilitating that trafficking as described throughout this Complaint.

f. Defendants participated in this venture through the conduct described throughout this Complaint as they were jointly responsible for relevant aspects of hotel operations.

g. C.J.'s trafficking at the Econo Lodge was a result of Defendants' participation in a venture with criminal traffickers. If Defendants had not continued participating in a venture that they knew or should have known violated 18 U.C.S. §1591(a), they would not have received a benefit from C.J.'s trafficking at the Econo Lodge.

89.     Through the conduct described above, Choice also knowingly benefited from engaging in a venture with Franchisee operating the Econo Lodge as follows:

a. Choice associated with Franchisee to operate the Econo Lodge.

b. Pursuant to the terms of the franchising agreement, both Choice and Franchisee received financial benefits from operating the Econo Lodge, including revenue generated specifically by renting rooms to traffickers. They engaged in revenue sharing and had a common incentive to maximize revenue.

c. This venture engaged in violations of 18 U.C.S. §1595(a) and 18 U.C.S. §1591(a) through the conduct of Franchisee and the widespread sex trafficking at the Econo Lodge.

d. Despite actual or constructive knowledge that the venture was engaged in violations of 18 U.C.S. §1595(a)  and 18 U.C.S. §1591(a), Choice participated in the venture

26

by continuing to associate with Franchisee to operate the Econo Lodge in in a way that it knew or should have known would lead to further violations of 18 U.C.S. §1595(a) and 18 U.C.S. §1591(a), including trafficking of victims like C.J.

e. C.J.'s trafficking at the Econo Lodge was a result of Choice and Franchisee's facilitation of widespread and ongoing sex trafficking at the Econo Lodge. Had Choice not continued participating in a venture with Franchisee that they knew or should have known was facilitating sex trafficking, they would not have received a benefit from C.J.'s trafficking at the Econo Lodge.

## CAUSE OF ACTION—SEX TRAFFICKING UNDER THE TVPRA

90. C.J. incorporates all other allegations.

91. At all relevant times, C.J. was and is a victim within the meaning of 18 U.S.C. § 1591 and 1595(a).

92. Defendants are liable as perpetrators within the meaning of 18 U.S.C. § 1595(a) because in the ways described above:

- Each Defendant knowingly or recklessly participated in harboring, maintenance, and/or other acts in further of sex trafficking, including the sex trafficking of C.J.; and

- Each Defendant knowingly benefitted, by receiving financial and other compensation, through their participation in a venture that they knew or were reckless in not knowing involved involving the trafficking, harboring, and maintenance of sex trafficking victims in exchange for financial benefits. 18 U.S.C. §§ 1590(a), 1591(a)(2), 1593A.

93. Defendants are liable as beneficiaries within the meaning of 18 U.S.C. § 1595(a) because, as described above, each and every Defendant knowingly benefitted, by receiving financial and other compensation, for their participation in a venture they knew or should have known was engaged in sex trafficking, in violation of the TVPRA, 18 U.S.C. § 1591, *et seq.*

27

94.    Despite knowledge of C.J.'s sex trafficking by the Defendants, C.J.'s trafficker was able to continue renting rooms for the sexual exploitation of C.J. at the Econo Lodge.

95.    Each Defendant participated in a venture together and with, among others, C.J.'s trafficker. Despite the fact that Defendants knew or should have known that C.J. was being sex trafficked in violation of the TVPRA, C.J.'s trafficker was able to continue renting rooms for the sexual exploitation of C.J. at the Econo Lodge. C.J.'s sex trafficker frequently used the subject Econo Lodge because they knew that staff members looked the other way despite obvious signs of trafficking. Each of the venturers shared a common purpose – the rental of hotel rooms and the making of profits. Each Defendant profited while C.J. 's trafficker was able to rent a secure venue to earn profits by trafficking C.J. Each Defendant participated in the venture by continually renting rooms to C.J.'s trafficker, failing to properly implement anti-trafficking rules and policies, and assisting traffickers to continue their sexual exploitation with minimal risk of detection and disturbance, all the while ignoring the obvious signs of C.J.'s trafficking.

96.    Each Defendant's failure to train and supervise their agents and employees and their inattention to the plights of their patrons, including C.J. at the Econo Lodge, enabled and contributed to the sex trafficking of C.J.

97.    Each Defendant received substantial financial benefits as a result of these acts and/or omissions. Choice received benefits in the way of management fees, royalty fees, reservation fees, marketing fees, and other ancillary fees from the operation of the Econo Lodge. Franchisee received benefits in the way of room rental fees, in-room purchases, and other ancillary expenses by patrons and visitors of the Econo Lodge.

98.     The facts alleged establish that each Defendant knowingly benefitted, financially or by receiving anything of value from participating in a venture that Defendants knew or should have known has engaged in an act in violation of the TVPRA.

99.     Each Defendant's TVPRA violations were a direct, producing, and proximate cause of the injuries and damages to C.J.

100.    C.J. further alleges that, as a result of the relationship between Choice and Franchisee, Choice is vicariously liable for the acts of Franchisee, including at the Econo Lodge. Factors that support this allegation are that Choice shared profits, standardized employee training, standardized and strict rules of operations, Choice controlled pricing and reservations, regularly conducted inspections, operational support and control, and other acts described above. Finally, Choice had the right to terminate any franchisee, including Franchisee, that failed to comply with the requirements promulgated by Choice. Thus, Choice retained control, or the right to control, the mode and manner of work contracted for.

101.    C.J. further alleges that Choice is vicariously liable for the acts and omissions of the staff at the subject Econo Lodge because Choice, together with Franchisee, acts as the joint employer of these employees because Choice and Franchisee jointly control the terms and conditions of their employment.

## DAMAGES

102.    Defendants' acts and omissions, individually and collectively, caused C.J. to sustain legal damages.

103.    Choice and Franchisee are joint and severally liable for all past and future damages sustained by C.J.

104.   C.J. is entitled to be compensated for personal injuries and economic damages, including:

a.   Actual damages;

b.   Direct damages;

c.   Incidental and consequential damages;

d.   Mental anguish and emotional distress damages (until trial and in the future);

e.   Lost earning capacity in the future;

f.   Loss of self-esteem and self-worth;

g.   Necessary medical expenses;

h.   Physical pain and suffering;

i.   Physical impairment;

j.   Emotional impairment;

k.   Unjust enrichment; and

l.   Penalties.

105.   C.J. is entitled to exemplary damages.

106.   C.J. is entitled to treble damages.

107.   C.J. is entitled to recover attorneys' fees and costs of court.

108.   C.J. is entitled to pre- and post-judgment interest at the maximum legal rates.

109.   A constructive trust should be imposed on Defendants, and the Court should sequester any benefits or money wrongfully received by Defendants for the benefit of C.J.

## STATUTE OF LIMITATIONS

110.   To the extent Defendants assert an affirmative defense of limitations, Plaintiff invokes the discovery rule. At the time she was harmed and through at least May 2013, C.J. was

under coercion and control of traffickers who abused and manipulated her. Thus, C.J. did not discover and could not reasonably have discovered the legal cause of her injury more than ten years before she filed this lawsuit. While she was under the control of her trafficker, C.J.—through no fault of her own—lacked the information to bring a claim because she did not know both her injury and the cause of her injury. This lack of information was due to no fault on the part of C.J. but rather was a direct result of C.J. being kept under the control of her traffickers, which Defendants facilitated.

111.    At the time Plaintiff was harmed, Plaintiff did not know that she was the victim of human trafficking as that term is defined by law, that her injury arose from being trafficked at Defendant(s) hotels or that she was a person trafficked, much less that she was being victimized by a human trafficking venture, and she did not discover and was not in a position to discover the legal cause of her injury, more than ten years before suit was filed..

112.    To the extent Defendants assert an affirmative defense of limitations, C.J. invokes the doctrine of equitable tolling because, as a result of being a victim of trafficking, C.J. faced extraordinary circumstances, which arose through no fault of her own, that prevented her from filing a lawsuit, and those circumstances did not end more than 10 years before C.J. filed this lawsuit.

113.    To the extent Defendants assert an affirmative defense of limitations, C.J. also invokes the continuing tort doctrine because this lawsuit arises out of a pattern of continuous and ongoing tortious conduct.

114.    C.J. was subject to continuous trafficking at the Econo Lodge through at least May 2013, which is not more than 10 years before C.J. filed this lawsuit.

115.    This continuous trafficking resulted from Defendants' continuous facilitating of trafficking at Econo Lodge and Defendants' ongoing venture with one another and with criminal traffickers.

116.    C.J.'s claims against Aashirad, LLC relate back to the filing of the Original Complaint because C.J. amended the Complaint to correct a mistake regarding the party named as franchisee of the Econo Lodge. Moreover, Aashirad, LLC, received and/or will receive notice of the action within the time allowed for service by Rule 4(m). Finally, within the time period for service by Rule 4(m), Aashirad, LLC, will know or should know that the action would have been brought against it, but for a mistake concerning the proper party's identity.

## **<u>JURY TRIAL</u>**

117.    C.J. demands a jury trial on all issues.

## RELIEF SOUGHT

118.    Wherefore, C.J. respectfully requests judgment against Defendants, jointly and severally, for actual damages in excess of the minimum jurisdictional limits of this Court, pre- and post-judgment interest as allowed by law, costs of suit, attorney fees, and all other relief, at law or in equity, to which she may be justly entitled.

Respectfully submitted,

**LOCKS LAW FIRM**

Dated: 7/26/23                    By:    _s/ Francesca A. Iacovangelo_____
FRANCESCA A. IACOVANGELO, ESQ.
601 Walnut Street, Suite 720 E
Philadelphia, PA  19147
(215) 893-3454
(215) 893-3444 Facsimile
fiacovangelo@lockslaw.com